**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
                                   )
**Sai Cornerstone Inc.,** )
**222 West Las Colinas Blvd, Suite 1480E** )
**Irving, TX 75039** )
                                   )
**MALIKA KISANRAI GAONKAR** )
**California, USA** )
                                   )
       **Plaintiffs,** )
                                   )     **Case No.: 19-CV-2816**
**v.** )
                                   )     **5 U.S.C. § 705 STAY REQUESTED**
**KATHY A. BARAN** )
**in HER Official Capacity,** )
**Director of the California Service Center** )
**U.S. Citizenship and Immigration** )
**Services, U.S. Department of** )
**Homeland Security** )
**24000 Avila Rd** )
**Laguna Niguel, CA 92677;** )
                                   )
**KENNETH T. CUCCINELLI** )
**in his Official Capacity,** )
**PurportedActing Director,** )
**U.S. Citizenship and Immigration** )
**Services, U.S. Department of** )
**Homeland Security** )
**20 Massachusetts Avenue, NW,** )
**Washington, DC 20529** )
                                   )
**KEVIN MCALEENAN,** )
**in his Official Capacity,** )
**Acting Secretary,** )
**U.S. Department of Homeland Security** )
**245 Murray Lane, SW,** )
**Washington DC 20528-0075** )
                                   )
**UNITED STATES CITIZENSHIP** )
**AND IMMIGRATION SERVICES** )
**20 Massachusetts Avenue, NW,** )
**Washington, DC 20529; and** )

|  | ) |
| UNITED STATES DEPARTMENT OF | ) |
| HOMELAND SECURITY, | ) |
| 245 Murray Lane, SW, | ) |
| Washington, DC 20528 | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND REVIEW OF
AGENCY ACTION UNDER THE ADMINISTRATIVE PROCEDURE ACT**

**INTRODUCTION**

1. This action seeks declaratory and injunctive relief against Kathy A. BARAN, Director of the California Service Center, U.S. Citizenship and Immigration Services ("USCIS"), U.S. Department of Homeland Security ("DHS"), Kenneth T. CUCCINELLI, Acting Director USCIS, Kevin MCALEENAN, Acting Secretary, U.S. Department of Homeland Security; USCIS; and DHS (collectively "the Government" or "Defendants") under the Administrative Procedure Act ("APA"), 5 U.S.C. §702, based on the Government's improper June 17, 2019 denial of Form I-129, Petition for Nonimmigrant Worker, otherwise known as an H-1B visa petition, filed by Sai Cornerstone Inc ("Sai") on behalf of Mallika Kisanrai Gaonkar, as a Project Manager.

2. The Government denied the H-1B petition to allow Ms. Gaonkar to continue working for Sai in a complex and senior position, one which USCIS previously granted. In light of the extensive evidence submitted by Sai in support of the H-1B petition and the flawed explanations in the Government's July 10th, 2019 denial, the denial was arbitrary, capricious and an abuse of discretion, or otherwise not in accordance with the law." Hence, Plaintiffs Sai Cornerstone and Ms. Gaonkar request that the Court hold unlawful and set aside the January 23, 2019 denial of Ms. Gaonkar's H-1B petition, order the

Government to approve the H-1B petition, and grant other appropriate declaratory and injunctive relief.

3.  Sai Cornerstone and Ms. Gaonkar expressly request a 5 U.S.C. § 705 stay of the July 10, 2019 denial and an extension of her current visa status pending resolution of this case. Sai Cornerstone and/or Ms. Gaonkar will suffer irreparable harm should the Court not grant an immediate stay of the Defendants' final agency action pending resolution of this case.

## JURISDICTION

4.  This case arises under the Immigration and Nationality Act ("INA") 8 U.S.C. § 1101 *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, as a civil action arising under the laws of the United States. This Court also has authority to grant declaratory relief under 28 U.S.C. §§2201-02, and injunctive relief under 5 U.S.C. §§ 702 and 705, and 28 U.S.C. §§ 1361. The United States has waived sovereign immunity under 5 U.S.C. §§702 and 705.

5.  Sai Cornerstone and Ms. Gaonkar may seek judicial review upon denial of the visa petition without any further administrative appeal. *See, e.g., EG Enters. v. DHS,* 647 F. Supp. 2d 728, 732-33 (E.D. Mich. 2006) (H-1B petition denial; USCIS agreed in its cross-motion that exhaustion is not required); *RCM Technologies, Inc. v. U.S. Dept. of Homeland Sec.,* 614 F. Supp. 2d 39,45 (D.D.C. 2009) ([P]laintiffs need not pursue an AAO appeal before seeking judicial review of denied visa applications in federal Court.")

## VENUE

6.  Venue is proper with this Court pursuant to 28 U.S.C. §1391(e)(1)(A), because this is a civil action in which the Defendants are employees or officers of the United States, acting

in their official capacity, and agencies of the United States, all of which (other than Defendant Baran, in her official capacity) reside in the District of Columbia and there is no real property involved.

## PARTIES

### Plaintiffs

7. Plaintiff, Sai Cornerstone Inc., is a Texas corporation with its principal place of business in Farmers Branch, TX. Sai Cornerstone, Inc., founded by, formed of, and managed by elite IT professionals, has been expanding its operations since its inception in 2001. The company provides consulting, application development, and support services across the globe in both onshore and offshore models. Sai Cornerstone's client list includes Fortune 500 companies in Manufacturing, Retail, Banking and Finance, Insurance, Mortgage, and Healthcare industries.

8. Sai Cornerstone, Inc. is uniquely competitive in the IT industry. Its technology solutions are developed by highly qualified and experienced professionals in house/onsite-client locations. The company offers project implementation and technology solutions for a variety of users and will work with IT teams in developing the solutions right for them.

9. Plaintiff Ms. Gaonkar is a citizen of India, currently residing in the United States. Ms. Gaonkar is an employee of Sai Cornerstone, and before her H-1B request for extension was denied by the Defendants, she was employed by Sai Cornerstone as a Project Manager, working on their Cisco Systems critical project. Ms. Gaonkar is currently in the United States, but it is not permitted to work and may need to leave the United States unless the Government's final agency action is stayed or reversed. Ms. Gaonkar is the

subject of the H-1B petition Sai Cornerstone filed, and she is directly impacted by the Government's July 10, 2019, final agency decision denying her H-1B visa.

## DEFENDANTS

10. Defendant, Kathy A. BARAN is the Director of the California Service Center. Among other things, the California Service Center is responsible for adjudicating visa petitions, such as the H-1B filed by Sai Cornerstone Inc on behalf of Ms. Gaonkar. Defendant Baran is sued in her official capacity.

11. Defendant Kenneth T. CUCCINELLI is the purported Acting Director of U.S. Citizenship and Immigration Services ("USCIS"). As Director, Defendant Cuccinelli has been delegated the authority to direct the administration of USCIS, and to enforce the Immigration and Nationality Act ("INA") and all other laws relating to the immigration of non-citizens. Defendant Cuccinelli is responsible for USCIS's policies, practices, and procedures, and oversees the USCIS officers responsible for adjudicating Plaintiff's H-1B visa petition. Defendant Cuccinelli is sued in his official capacity. A complaint for declaratory and injunctive relief was filed in federal district court for the District of Columbia on September 6, 2019, alleging that Mr. Cuccinelli does not satisfy the legal requirements to serve as the director under Federal Vacancies Reform Act ("FVRA") and the Constitution. That lawsuit is ongoing.

12. Defendant Kevin MCALEENAN is the Acting Secretary of the U.S. Department of Homeland Security ("DHS"). DHS is the federal agency encompassing USCIS, which is responsible for the administration and enforcement of the INA and all other laws relating to the immigration of non-citizens. In his official capacity as Director, Defendant McAleenan has the responsibility of the administration and enforcement of the

immigration and naturalization laws pursuant to section 402 of the Homeland Security Act of 2002, 107 Pub. L. No. 296, 116 Stat. 2135 (Nov. 25, 2002); *see also* 8 U.S.C. § 1103(a). Defendant McAleenan is sued in his official capacity.

13. Defendant U.S. Citizenship and Immigration Services is an agency of the DHS and is responsible for overseeing the adjudication of immigration benefits. USCIS implements federal law and policy with respect to immigration benefits applications. USCIS's headquarters resides within the District of Columbia.

14. Defendant the U.S. Department of Homeland Security is a cabinet department of the United States federal Government responsible for immigration-related services (U.S. Citizenship and Immigration Services or "USCIS"), enforcement (Immigrations and Customs Enforcement or "ICE"), and investigations (Homeland Security Investigations or "HSI"), among other duties. DHS oversees USCIS and its implementation of federal law and policy with respect to immigration benefits applications. DHS's headquarters resides within the District of Columbia.

## LEGAL BACKGROUND

15. The H-1B specialty occupation visa program, codified at 8 U.S.C. §1101(a)(15)(H)(i)(b), allows United States employer to brig foreign workers holding at least the equivalent of a bachelor's degree into the United States for employment in a specialty occupation. Congress set a statutory ceiling on the number of H-1B petitions the Government may issue (with some exemptions): 65,000 for individuals with baccalaureate egress and an additional 20,000 for individuals who hold U.S. Master's degrees. 8 U.S.C. §1184(g)(5) (C).

16. Prior to 1990, the Immigration and Naturalization Service ("INS"), Defendant USCIS's predecessor in interest, was the sole agency authorized by Congress to regulate the admission of what was then called the "H-1" visa category for nonimmigrant professional workers of distinguished merit and ability. 8 U.S.C. §1101(a)(15)(H) (1990).

17. In 1990 Congress amended the INA, materially altering the professional H-1 visa program and the way in which it is administered. See Immigration Act of 1990 ("IMMACT 90"), Pub. L. 101-649, 104 Stat. 4978, 5019-22 (1990) (codified as amended at 8 U.S.C. §§1184(g)-(i), 1101(a)(15)(H)(i), 1182(n)). Congress permitted foreign professional employees in "specialty occupations" to work in the United States in H-1B status for three years increments.

An H-1B visa is available to:

> An alien…who is coming temporarily to the United States to perform, services… in a specialty occupation described in section 1184(i)(1) of this title…who meets the requirements for the occupation-specific in section 1184(i)(2) of this title…and with respect to whom the Secretary of Labor determines and certifies to the [DHS] that the intending employer has filed with the Secretary an application under section 1182(n)(1) of this title…

8 U.S.C. §1101(a)(15)(H)(i)(b).

18. Notably, through IMMACT 90, Congress stripped the INS of its previously unfettered authority over nonimmigrant professional visa classification and split the administration of, and jurisdiction over, the H-1B visa program, between the Department of Labor ("DOL") and the INS. 8 U.S.C. §§1182(n), 1184(g), 1184(i).

**Labor Condition Application ("LCA")**

19. The H-1B process established by IMMACT 90 remains effective today, and begins with employers filing a Labor Condition Application ("LCA") with DOL. 8 U.S.C. §1182(n)(1).

20. Through the LCA, the employer certifies, among other things, that during the period of authorized employment, the employer is offering and will continue to offer a wage that is at least "the actual wage level paid by the employer to all other individuals with similar experiences and qualifications for the specific employment in question" or "the prevailing wage level for the occupational classification in the area of employment," whichever is higher, and that the employer will provide "working conditions… that will not adversely affect the working conditions of workers similarly employed." 8 U.S.C. §1182(n)(1)(A). On the LCA, an employer must list the occupation, duration of the LCA validity period, prevailing wage, and "area of intended employment." See ETA 9035. If the LCA is complete and contains no obvious inaccuracies, DOL certifies the application, 8 U.S.C. §1182(n)(1), enabling the employer to proceed to the next step in the application process, which is the H-1B petition filed with Defendants USCIS.

21. Although DOL's role in administering the H-1B program may appear perfunctory, it is anything but. By completing and signing the LCA, the employer becomes subject to DOL's jurisdiction and enforcement authority for the duration of the worker's H-1B visa status plus one year afterward. 8 U.S.C. §1182(n)(2); 20 C.F.R. §655.700 *et. Seq.* DOL has broad powers to protect U.S. workers' wages and working conditions and to enforce the terms of the LCA. 8 U.S.C. §§1182(n), (p).

**American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA")**

22. DOL's authority over the H-1B program-especially as it relates to wage protection-was expanded in 1998 through passage of the American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA"), Pub. L. 105-277, 112 Stat. 2681, 641-655 (1998) (codified as amended at 8 U.S.C. §§1184(c), (g), 1182(n)).

23. Critically for purposes of this action, the ACWIA established a framework to address the problem of H-1B employer who lacks sufficient work for their H-1B employees. See 8 U.S.C. §1182(n)(2)(c)(vii). When an employer places an employee in "nonproductive status," the employer must continue to pay the H-1B employee the wage set forth in the LCA, otherwise the employer is in violation of the condition of the LCA. 8 U.S.C. §§1182(n)(c)(vii)-(D); 20 C.F.R. §655.731(c)(7)(i); *see also Administrator, WHD v. Lambents Group & Venkat Potini*, 08-LCA-36 (ALJ Jan. 27, 2010) (fining employee entitled to back pay, including nonproductive work, once she entered into employment and became eligible for work). Essentially, H-1B employers who find that they lack sufficient work for an H-1B employee to perform have two choices: (1) terminate the employee and pay for his or her return home; or (b) continue to pay the wage required on the LCA until there is once again work to perform. 8 U.S.C. §1182(n)(2)(C)(vii).

24. Even though Congress anticipated the issue underlying USCIS's denial of Sai Cornerstone's petition for Ms. Gaonkar, Congress chose not to require an employer to demonstrate that they have sufficient specialty occupation work for an intended beneficiary at the time of filing the H-1B petition, nor did Congress forbid employers from retaining H-1B workers for yet-to-be-determined projects. Through the ACWIA, Congress permitted an employer to hire workers even where there was a risk they would enter "nonproductive status," and addressed that scenario by empowering DOL to force

employers to provide back pay to workers who are not given sufficient work to perform. 8 U.S.C. §1182(n)(2)(c)(vii).

**Specialty Occupation**

25. Turning to USCIS's role in the administration of the H-1B program, other than rendering admissibility determinations required of all visa applicants, Congress delegated two principal tasks to USCIS: determining whether the position the employer seeks to fill qualifies as a "specialty occupation"; and assessing whether the noncitizen worker meets the minimum requirements for that position. 8 U.S.C. §1184(i); 8 C.F.R. §214.2(h)(i)(B) (2).

According to 8 U.S.C. §1184(i)(1), the terms "specialty occupation" means an occupation that requires-

(A)  Theoretical and practical application of a body of highly specialized knowledge, and
(B) Attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States.

An employer may demonstrate that a job offer qualifies as a "specialty occupation" by establishing:

(1) A baccalaureate or higher degree or its equivalent is normally the minimum requirement for the entry into the particular position;
(2) The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;
(3) The employer normally requires a degree or its equivalent for the position; or
(4) The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

8 C.F.R §214.2(h)(4)(iii)(A).

26. The Form I-129 instructions identify the evidence employers must file in support of their H-1B petitions. See USCIS, Form I-129 Instructions at 7-8. Available at https://www.uscis.gov/sites/default/files/files/form/i-129insr.pdf. The instructions generally track the dual adjudicative responsibility of USCIS: determining whether the position the employer seeks to fill qualifies as a "specialty occupation;" and whether the noncitizen worker meets the minimum requirements for that position. 8 U.S.C. §1184(i); 8 C.F.R. §214.2(h)(4)(i)(B)(2). Notably, employers are not required to submit evidence demonstrating that they have specialty occupation work for the beneficiary to perform throughout the entire requested H-1B validity period.

## FACTUAL ALLEGATIONS

27. On February 25, 2019, Sai Cornerstone, Inc. filed a Petition for Nonimmigrant Worker (Form I-129) for Ms. Gaonkar, a citizen of India, petitioning to amend and extend her H-1B status, granted by the Defendant twice (with initial H-1B approved on 10/01/2015), so that she could continue to work for Sai Cornerstone in the specialty occupation of Project Manager.

28. Ms. Gaonkar holds a bachelor's degree in Electronics & Communication Engineering with a concentration in Computer Science from Karnataka University, Dharward, Karnataka India. Ms. Gaonkar also had extensive practical experience and expertise in technologies (Azure analysis services, data lake analytics, data lake store, data factory v2, cosmos db), Power BI-business analytics service provided by Microsoft.

29. As a Project Manager for Sai Cornerstone, Ms. Gaonkar performed the following duties:

- *Achieve software development project activities for multiple projects across all project phases, including initiation, planning, execution, monitoring, control and closure for team Angular JS for Front end development and Spring Boot for Java back-end development, Microservices Architecture, Python and database (Oracle);*

- *Execute agile projects & manage multiple scrums;*

- *Work collaboratively with development team, lead architect and the management to determine technical direction and approach to system design and implementation;*

- *Tailor project management, development, and support processes to meet the needs of individual (new and/or ongoing) projects;*

- *Manage the day-to-day activities of projects and staff; communicate with project teams as necessary to ensure project deliverables are on schedule and within cost parameters;*

- *Communicate and collaborate with internal and external customers as needed in regards to project deliverables including managing expectations, presenting and interfacing with sponsors;*

- *Make decisions and communicate trade-offs and risks; drive key decisions across projects;*

- *Engage with Engineering Teams for configuration management, deployment tools, and continuous integration activities; and*
- *Make decisions and communicate trade-offs and risks; drive key decisions across projects.*

30. In support of its petition, Plaintiff supplied a Labor Condition Application ("LCA") (Case Number I-200-19015-200338), certified by the U.S. Department of Labor for the requested validity period of January 01, 2019 through January 14, 2022; a letter from middle vendor Valleysoft Systems, Inc., detailing the nature of its relationship with Sai Cornerstone, Inc. and their client Zensar Technologies Inc.; a letter from middle vendor Zensar Technologies, detailing the nature of its relationship with Sai Cornerstone, Inc and their client Cisco Systems, Inc., the scope of the specialty occupation work, and Sai Cornerstone, Inc's right to control the work of Ms. Gaonkar ; A copy of Sai Cornerstone, Inc's organizational chart, including Mrs. Gaonkar and her direct manager at Sai Cornerstone, Inc, Mr. Ramki Chebrolu. Mr. Chebrolu is directly responsible for managing

Mrs. Gaonkar's work; A copy of Right to Control agreement between the Petitioner and the Beneficiary; Signed Employment Agreement; Signed Employee Handbook; A copy of the weekly report Mrs. Gaonkar submits through her timesheets to her manager at Sai Cornerstone, Inc, Mr. Ramki Chebrolu, tracking her project management, output, and future work product goals. Mr. Chebrolu uses the weekly report, among other things, to supervise Mrs. Gaonkar's work and work products; A copy of Mrs. Gaonkar's Performance Evaluation, as completed by her direct manager at Sai Cornerstone, Inc, Mr. Ramki Chebrolu; Paystubs for Mrs. Gaonkar, for work performed through present day. Mrs. Gaonkar is paid directly by Sai Cornerstone, Inc and receives payment via direct deposit.

31. The position of Project Manager offered to Ms. Gaonkar has a great number of technical responsibilities that could not be performed by an individual lacking the equivalent of a U.S. bachelor's degree. These responsibilities, include: Achieve software development project activities for multiple projects across all project phases, including initiation, planning, execution, monitoring, control and closure for team Angular JS for Front end development and Spring Boot for Java back-end development, Microservices Architecture, Python and database (Oracle); Execute agile projects & manage multiple scrums; Work collaboratively with development team, lead architect and the management to determine technical direction and approach to system design and implementation; Tailor project management, development, and support processes to meet the needs of individual (new and/or ongoing) projects; Manage the day-to-day activities of projects and staff; communicate with project teams as necessary to ensure project deliverables are on schedule and within cost parameters; Communicate and collaborate with internal and

external customers as needed in regards to project deliverables including managing expectations, presenting and interfacing with sponsors; Make decisions and communicate trade-offs and risks; drive key decisions across projects; Engage with Engineering Teams for configuration management, deployment tools, and continuous integration activities; and; Make decisions and communicate trade-offs and risks; drive key decisions across projects."

32. On April 03, 2019, the Plaintiff requested to upgrade the pending H-1B request for an extension to premium processing. For an additional filing fee of $1410.00, the Defendant is required to decide on the pending H-1B petition in fifteen calendar days.

33. On or about April 16, 2019, the USCIS California Service Center issued a Request for Evidence to Sai Cornerstone Inc. requesting the Plaintiff to demonstrate 1) a valid employer-employee relationship and 2) illustrative categories of information regarding whether Ms. Gaonkar's Project Manager position is a "specialty occupation."

34. On May 15, 2019, Sai Cornerstone Inc. responded to Defendants' Request for Evidence with detailed supplemental evidence addressing the Defendants' request.

• *A copy of the recently assessed Project review by the end-client, Cisco, confirming the technical phases and length of the project until at least Financial year 2023, specifying each year's goals of the Project. Ms. Gaonkar's services are anticipated for their continuous and critical project and confirming that her 'technical expertise' is needed to 'meet the project deadline,' requiring her flawless work-continuity.*

• *A copy of the "Flexible Consumption Model (FCM) - Migration of Monexa subscriptions to Annuity" project ("Project") technical design details (with specific technical details pg. 8) emphasizing Ms. Gaonkar's role as technical Project Manager being in-charge of the systems architecture and access control of the entire*

*Project. Ms. Gaonkar is currently and likely to be associated with the current project until at least July 2021. The timeline of the project with various complex phases is expected to be until fourth year of fiscal year 2023 as laid out in the 'Cisco's Business Value Metrics: FY19-FY23.' The project description also confirms the need for technical expertise in the area of specific vendor (such as Coca-Cola, Ford, Home Depot, Verizon, etc.) complex solutions in various quarters until FY 2022.*

- *A copy of Ms. Gaonkar's intranet and outlook profile at the end-client establishing her active role in the project especially during the critical phase of 'Dataset-up and Data migration'; and her active coordination with several other major teams that are contributing to the success of the current project.*

- *A copy of Ms. Gaonkar's badge at the end-client as a contractor and her access to WebEx meetings as a consultant/contractor.*

- *A copy of the end-client's confirmation of Ms. Gaonkar's role as Project Manager' along with other managerial hierarchy of the Project.*

- *A copy of an email from middle vendor, Zensar Technologies Inc ("Zensar") confirming its relationship with the end-client and the placement of Ms. Gaonkar as a consultant at the end-client expressing their inability to provide a letter to non-direct employees of the end-client as per Cisco strict policies.*

- *A copy of the press release confirming the 17-year relationship between the middle vendor Zensar and the end-client Cisco, where at Zensar placed at least 1600 consultants at various projects.*

- *A copy of middle vendor's repetitive appreciation of the Beneficiary, whom they placed at the end-client pursuant to an ongoing business relationship, for being a valued asset to the criticality of the project through their recognitions.*
- *A copy of a letter from middle vendor Valleysoft Systems, Inc ("Valleysoft") confirming the subcontractor agreement between Valleysoft and the Petitioner, outlining the scope and the terms of any consultant's employment, specifically confirming that the SCI will be the sole employer of the consultant [the beneficiary].*

- *Appendix A of the master consulting services agreement confirms the project is extendable consistent with prior renewals.*

- *The petitioning entity's technical manager's letter explaining the expanded technical description of the work to be performed by the beneficiary. This includes the percentage of time spent on each duty, an explanation of the educational requirements for each duty, and an explanation of how Ms. Gaonkar's educational background directly relates to each duty. The technical manager's explanation especially confirms why a specialized knowledge through certain education and experience is required to accomplish the assigned tasks.*

- *An explanation by the petitioning entity's technical manager about a typical day of the beneficiary in proffered position along with percentage of time allocation, performing elaborated complex and unique duties requiring specialized knowledge obtained through minimum bachelor's level education in a specific relevant field.*

- *A copy of end-client – Cisco's and the middle vendor Zensar's job announcement for a similar position requiring a minimum of bachelor's degree in a related field such as 'Engineering or Technology.' This confirms that for a similar position and identical job duties, the client's job requirements include about years of project management experience with a minimum bachelor's degree in Computer Science, Engineering, Technology, or related field making it a specialty occupation, all of which the beneficiary possesses to competently perform the assigned complex responsibilities.*

35. On May 28, 2019, the Government denied the petition filed by Sai Cornerstone Inc. on behalf of Ms. Gaonkar. The decision acknowledges the existence of some of the evidence provided by Sai Cornerstone and then summarily disregarded all if it, including documentation provided by the end-client, Cisco Systems such as project review, technical designs model, job posting, press release, employment confirmation of Ms. Gaonkar to demonstrate a valid employer-employee relationship.

36. On June 12, 2019, Sai Cornerstone Inc. refiled a Petition for Nonimmigrant Worker (Form-129) on behalf of Ms. Gaonkar, a citizen of India, and requested a *Nunc Pro Tunc* Relief. The Defendant accepted the new filing on June 13, 2019, cashed the checks, and issued a receipt notice.

37. In support of its second attempt to extend Ms. Gaonkar's H-1B petition, the Plaintiff supplied a Labor Condition Application ("LCA") (Case Number I-200-19015-200338), certified by the U.S. Department of Labor for the requested validity period of January 15, 2019, through January 14, 2022.

16

38. On or about June 26, 2019, the USCIS California Service Center issued a Request for Evidence to Sai Cornerstone Inc. alleging that the information provided did not adequately establish Plaintiff's right to control Ms. Gaonkar. According to the Request for Evidence (RFE), "the record does not contain sufficient documentary evidence of this work arrangement, nor does the evidence of the record establishes your right to control when, where, and how the beneficiary will perform the job." Additionally, the Request for Evidence (RFE) sought evidence there were specific and non-speculative qualifying assignments in a specialty occupation for the beneficiary for the entire time requested on the application. Finally, the Request for Evidence (RFE) requested information regarding whether Ms. Gaonkar's Project Manager position is a "specialty occupation."

39. On June 28, 2019, Sai Cornerstone Inc. responded to Defendants' Request for Evidence with the following supplemental evidence:

- *copy of a letter issued by end-client Cisco Systems, Inc. ("Cisco"), confirming that Ms. Gaonkar's services are anticipated for their continuous and critical project and confirming that her 'technical expertise' is needed to 'meet the project deadline,' requiring her flawless work-continuity.*

- *A copy of middle vendor Zensar's letter confirming the position as a specialty occupation and the petitioner is Ms. Gaonkar's employer establishing right of control and supervision. This letter also delineates the relationship between the middle vendor and the end-client Cisco Systems, Inc.*
  *A copy of Statement of Work ("SOW") issued by the end-client to the middle vendor, 'Zensar' exclusively for the consultant (Ms. Gaonkar/ the Beneficiary) clearly defining the specialty occupation services to be performed by the beneficiary and the work product to be delivered by her. Please note that the attached SOW is valid until **July 26, 2023,** and the submitted LCA is well within this period.*

- *A copy of Subcontractor Agreement between the middle vendor, Zensar Technologies, Inc and the petitioner, Sai Cornerstone, Inc is confirming the employee relationship of the Consultant (beneficiary) with the Subcontractor (Petitioner) and petitioner's right of control over the employee (consultant).*

- *A copy of the recently assessed Project review by the end-client, Cisco, confirming the technical phases and length of the project until at least Financial year 2023, specifying each year's goals of the Project. Ms. Gaonkar's services are anticipated for their continuous and critical project and confirming that her 'technical expertise' is needed to 'meet the project deadline,' requiring her flawless work-continuity. This has been confirmed by the middle vendor as well in the letter submitted to the USCIS saying that "Ms. Gaonkar's skills are key to the success of the project."*

- *A copy of the "Flexible Consumption Model (FCM) - Migration of Monexa subscriptions to Annuity" project ("Project") technical design details (with specific technical details pg. 8) emphasizing Ms. Gaonkar's role as technical Project Manager being in-charge of the systems architecture and access control of the entire Project (pgs. 2 and 14).*

- *Ms. Gaonkar is currently and will be associated with the current project until at least July 2023. The timeline of the project with various complex phases is expected to be until fourth year of fiscal year 2023 as laid out in the 'Cisco's Business Value Metrics: FY19-FY23.' The project description enclosed herewith also confirms the need for technical expertise in the area of specific vendor (such as Coca-Cola, Ford, Home Depot, Verizon etc.) complex solutions in various quarters until FY 2022.*

- *A copy of Ms. Gaonkar's intranet and outlook profile at the end-client establishing her active role in the project especially during the critical phase of 'Dataset-up and Data migration'; and her active coordination with several other major teams that are contributing to the success of the current project.*

- *A copy of Ms. Gaonkar's badge at the end-client as a contractor and her access to WebEx meetings as a consultant/contractor.*

- *A copy of the end-client's confirmation of Ms. Gaonkar's role as Project Manager' along with other managerial hierarchy of the Project.*

- *A copy of Consultant's (beneficiary) signed agreement with the end-client titled as 'Cisco Confidential Information Agreement' at the initiation of the current project.*

- *A copy of an email from middle vendor, Zensar Technologies Inc ("Zensar") confirming its relationship with the end-client and the placement of Ms. Gaonkar as a consultant at the end-client expressing their inability to provide a letter to non- direct employees of the end-client as per Cisco strict policies.*

  *Please note that the Manager-Talent Acquisition of the middle vendor, Zensar, through whom Ms. Gaonkar is placed at the end-client (Cisco) confirming that the position needs "specialized occupation" and "is a long-term project."*

- *A copy of the press release confirming the 17-year relationship between the middle vendor Zensar and the end-client Cisco, where at Zensar placed at least 1600 consultants at various projects.*

- *A copy of middle vendor's repetitive appreciation of the Beneficiary, whom they placed at the end-client pursuant to an ongoing business relationship, for being a valued asset to the criticality of the project through their recognitions.*

- *The petitioning entity's technical manager's letter explaining the expanded technical description of the work to be performed by the beneficiary. This includes the percentage of time spent on each duty, an explanation of the educational requirements for each duty, and an explanation of how Ms. Gaonkar's educational background directly relates to each duty. The technical manager's explanation especially confirms why a specialized knowledge through certain education and experience is required to accomplish the assigned tasks.*

- *An explanation by the petitioning entity's technical manager about a typical day of the beneficiary in proffered position along with percentage of time allocation, performing elaborated complex and unique duties requiring specialized knowledge obtained through minimum bachelor's level education in a specific relevant field.*
  *Prior to placing the beneficiary at the client location on a project, SCI ensured that Ms. Gaonkar has the right skills to complete assigned tasks in the proffered position or risk failure. SCI, as an employer, has a thorough understanding of which tasks to assign to Ms. Gaonkar, based on the current proffered position's responsibilities, capability and training needs to complete the tasks, as such the petitioner aptly concluded that Ms. Gaonkar is a right fit for the client's job requirements.*

- *A copy of end-client – Cisco's and the middle vendor Zensar's job announcement for a similar position requiring a minimum of bachelor's degree in a related field such as 'Engineering or Technology.' This*

*confirms that for a similar position and identical job duties, the client's job requirements include about years of project management experience with a minimum bachelor's degree in Computer Science, Engineering, Technology, or related field making it a specialty occupation, all of which the beneficiary possesses to competently perform the assigned complex responsibilities.*

40. On or about July 10, 2019, the Government denied the petition filed by Sai Cornerstone Inc. on behalf of Ms. Gaonkar. The decision acknowledged the documentation provided by Plaintiff and then summarily disregarded it. The decision discounted the letter issued by the end-client Cisco Systems, Inc. confirming that Ms. Gaonkar's services are anticipated for their critical project and confirming her "technical expertise" is needed to meet the project deadline, requiring her flawless work-continuity. The decision also ignored Ms. Gaomkar's technical manager's letter explaining in detail the expanded technical description of the work to be performed by the beneficiary. The letter explained why a specialized knowledge through certain education and experience is required to accomplish the assigned tasks.

41. It is important to note that the Government did not conclude that Ms. Gaonkar is not qualified to perform specialty occupation-level work.

42. If the Court were not to grant the requested 5 U.S.C. § b705 stay of the Defendant's final agency action immediately, Ms. Gaonkar will be irreparably harmed. Among the irreparable harm Ms. Gaonkar will suffer includes, but not limited to: (a) accrue unlawful presence (b) default on her apartment lease and car loans and suffer related Financial penalties she would not otherwise have incurred but for the Defendants' action;(c ) lose all career progress and momentum she has accumulated at Sai Cornerstone while working in the U.S.

43. Similarly, if the Court were not to grant the requested 5 U.S.C. § 705 stay of the Defendants' final agency action, Sai Cornerstone, a U.S. corporation, will be irreparably harmed. Ms. Gaonkar possess a unique blend of directly applicable education and years of experience working for Sai Cornerstone Inc. Sai Cornerstone Inc. will not be able to find a suitably educated replacement for Ms. Gaonkar and get that replacement up to speed to perform at a minimal level of proficiency involving the current project where Ms. Gaonkar spent more than three years. In the interim, Sai Cornerstone Inc. would be without a Project Manager providing services to its end-client Cisco Systems', Inc. critical project, and lacks the competitive advantage Ms. Gaonkar provides. As a result, Sai Cornerstone would likely lose numerous other contracts and revenue of about $250,000. Additionally, Sai Cornerstone, Inc would be liable to the extent of $100,000 under its contractual terms entered into with middle vendor (s) for not being able to perform under the contract for no fault of its own.

44. Defendants will not be harmed should the Court grant 5 U.S.C. § 705 stay of the Defendants' final agency action and permit Ms. Gaonkar to work and remain in the United States pending a decision in this case. It is in the public interest for the Court to grant a 5 U.S.C. § 705 stay of the Defendants' final agency action and permit Ms. Gaonkar to work and remain in the United States pending a decision in the case  so as to ensure that the INA and implementing regulations are properly applied to the facts of Plaintiffs' H-1B petition and that visa applicants and beneficiaries are granted full due process rights and the Government comports with the rule of law.

**COUNT ONE**
**Violation of the Administrative Procedure Act**
**5 U.S.C. § 701, et seq.**

45. Sai Cornerstone Inc. re-alleges and incorporates by reference herein all of the allegations set forth above.

46. The APA empowers this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

47. As discussed above, the fining that Sai Cornerstone Inc. and Ms. Gaonkar lack an employer-employee relationship is arbitrary and capricious because the record shows that Sai Cornerstone Inc. has the right to control her work and there is no evidence in the record to the contrary.

48. "The general definition of the term 'servant' in the Restatement (Second) of Agency § (2) (1958), for example, refers to a person whose work is "controlled or is subject to the right to control by the master." See *also*., § 220(1) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or *right to control*"). *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003). "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. *Nationwide Mut. Ins. Co. v Darden*, 503 U.S. 318, 323 (1992). "*In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so*." Chin v. United States, 57 F.3d 722, 725 (9th Cir. 1995).

49. Here there is no dispute that Sai Cornerstone Inc. has the right to control Ms. Gaonkar's work. In particular, it is undisputed that Sai Cornerstone Inc. has controlled and supervised Ms. Gaonkar's work, since 02/09/2016 when the Defendants approved Sai Cornerstone's initial H-1B petition filed on behalf of Ms. Gaonkar. Additionally, it is undisputed that Sai Cornerstone's contract with her and its Employee Handbook provides it with the complete right to control her work by expressly providing that:

- *Employees working a forty-hour work week are paid a fixed amount of salary every pay period. They are eligible for full-time benefits including ten days paid vacation and five days paid sick leave after six months of employment. They are also eligible for company-paid holidays and comprehensive health insurance coverage.*
- *Employees will work under the supervision and control of Sai Cornerstone Inc throughout the time they are employed by Sai Cornerstone Inc.*
- *Employees will telephone or otherwise communicate directly with Mr. Ramki Chebrolu no less than once a week regarding their progress on the assigned work.*
- *Employees will be called upon to assist the employees of companies other than Sai Cornerstone Inc in their work; only Sai Cornerstone Inc has the right to control the work of the employees on a day-to-day-basis.*
- *Sai Cornerstone will retain the full right to assign additional duties to its employees at all times.*
- *Sai Cornerstone Inc. will retain full discretion over when and how long employee will work, the provision of employee benefits, the method of payment, and the right to hire and pay any assistants.*

50. Further, it is also undisputed that Cisco Systems, Inc, the entity controlling the location at which Ms. Gaonkar will provide services, also fully acknowledges and corroborates Sai Cornerstone's complete right to control her work, by affirming that:

- *Sai Cornerstone Inc. has selected and deployed their employee Ms. Gaonkar, to render the below detailed services. During this contract and at all times, Ms. Gaonkar's primary employer, Sai Cornerstone Inc. is responsible for her salary, benefits, and training needed to perform her job duties at their work site, in addition to any discretionary decision making, such as hiring and firing and performance evaluation."*

51. Lastly, to fully comply with the Request for Evidence, and prove the requisite employer-employee relationship existed since 02/09/2016 and will continue to exist,   Sai

Cornerstone Inc. submitted copies of Ms. Gaonkar's W-2 for years 2017 and 2018, confirming that the Plaintiff is the sole employer, a copy of the weekly reports Ms. Gaonkar submits to her manager, Mr. Praveen Singh, tracking her project management, output and future work product goals; a copy of Ms. Gaonkar's Performance Evaluation as completed by her direct manager at Sai Cornerstone; a copy of the state wage report filings by the petitioner for the beneficiary and the last four digits of the beneficiary's Social Security Number; paystubs for Ms. Gaonkar. For work performed through present day; copies of Sai Cornerstone's most recently filed quarterly tax filings for 2018 and the annual federal income tax returns for year 2017 including all required schedules and statements.

52. In the decision denying this petition the USCIS concedes that "neither the legacy Immigration and Naturalization Services (INS) nor USCIS has defined the terms "employee," "employed," "employment," or "employer-employee relationship" by regulation for purposes of the H-1B visa classification, even though the regulation describes H-1B beneficiaries as "employees" who must have an "employer-employee relationship" with a U.S. employer. Therefore, for purposes of the H-1B classification, these terms are undefined."

53. Inasmuch as these terms are undefined by the agency, one looks to the common law definition of the terms, in regards to which, as noted above, the Supreme Court has found that "A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or *right to control" Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003) (emphasis supplied) and "In determining whether a hired party

is an employee under the general common law of agency, we consider the hiring party's *right to control* the manner and means by which the product is accomplished. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992).

54. Further, as also noted above "In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so." *Avis Rent a Car Sys., Inc. v United States*, 503 F 2d 423, 425 n.1 (2d Cir. 1974); *Trent v Atl. City Elec. Co.,* 334 F. 2d 847, 863 (3d Cir. 1964); *Am. Consulting Corp. v. United States*, 454 F. 2d 473, 474 (3d Cir. 1971), *Weber v Commissioner*, 60 F 3d. 1104, 1110 (4th Cir. 1995); *Breaux & Daigle, Inc. v United States*, 900 F.2d 49, 50 (5th Cir. 1990); *Peno Trucking. Inc. v. Commissioner*, 296 F. App'x 449, 455 (6th Cir. 2008); *Sargent v Commissioner*, 929 F 2d 1252, 1253 (8th Cir. 1991); *Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1120(9th Cir. 2011); *Jones v Goodson*, 121 F. 2d 176, 177 (10th Cir. 1941).

55. However, while conceding that "in considering whether or not one is an "employee" in an "employer-employee relationship" with a "United States employer" for purposes of H-1B nonimmigrant petitions, USCIS focuses on the common law touchstone of "control" the decision inexplicably fails to mention that it is the "right to control" not merely control itself, which is looked to." *Id.*

56. Nevertheless, the decision does observe that 8 CFR § 214.2(h)(4)(ii)(2) define(es) a "United States employer" as one who "has an employer-employee relationship with respect to employees under this part, as indicated by the fact that it may hire, pay, fire, supervise, or otherwise control the work of any such employee…"*Id.*

57. The fact that an employer only "may" control the work of any other employee (rather than "must") demonstrates that, consistent with Clackamas, Darden, and the decisions of the 2nd, 3rd, 4th, 5th, 6th, 8th, 9th, and 10th circuits, it is only the right to control and not the actual exercise of the same which is determinative of an employer-employee relationship.

58. Nevertheless, the decision fails to identify a single iota of evidence in the record which shows that not only didn't Sai Cornerstone have the right to control the work of Ms. Gaonkar, but even that it would not actually exercise it.

59. Accordingly, the USCIS's decision that Sai Cornerstone lacks an employer-employee relationship with the beneficiary is arbitrary and capricious. *Assn of Data Processing Serv. Orgs., Inc. v. Bd. Of Governors of Fed Reserve Sys*., 745 F.2d 677, 683-84 (D.C. Cir. 1984) (Scalia, J.).

## COUNT TWO
### Violation of the Administrative Procedure Act
### 5 U.S.C. §701, et seq.

60. Plaintiff re-alleges and incorporates by reference herein all of the allegations set forth above.

61. The APA empowers this Court to hold unlawful and set aside agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2).

62. Here, Defendants' decision is unlawful and should be set aside, because USCIS does not have the authority under INA or its implementing regulations to require an employer petitioning for an H-1B worker to demonstrate, at the time of filing the H-1B petition, that the employer has three years' worth of work for the prospective employee to

complete. Rather, by instructing USCIS to determine whether the position is a "specialty occupation," Congress directed USCIS to assess the type of job the H-1B worker will fill, not the specific tasks he or she may be assigned to complete in a future three-year period. 8 U.S.C. §§1101(a)(15)(H)(i)(b); 1184(c). USCIS's own regulation support this interpretation. 8 C.F.R. §214.2(h)(4)(i)(B)(2).

63. Moreover, the statute, read as a whole, makes plain that Congress neither authorized nor intended to authorize USCIS to require such an onerous showing of employer-petitioners seeking H-1B classification for their prospective employees. In fact, Congress contemplated the very issue USCIS alleges is at play here-insufficient specialty occupation work and asked the Secretary of Labor with addressing it, by forcing employers to provide back pay to so-called "benched" employees. 8 U.S.C. §§1182(n)(2) (C)(vii)-(D). What is more, Congress knew perfectly well how to signal to Defendants that a petitioner for a particular visa category must furnish a detailed plan of what he or she will do while in the United States yet no such language appears in the H-1B provisions of the statute. *Compare* 8 U.S.C. §§1101(a)(15)(H)(i)(b), 1184(c) with 8 U.S.C. §§1101 (a)(15)(H)(iii), (J) (authorizing visas for individuals coming to participate in specific exchange or medical training "programs"); see also 8 C.F.R. §214.2(f)(10)(C) (7) (describing "training plans" for certain student visa holders).

64. Assuming, *arguendo*, that USCIS has the authority to require three years' worth of specialty occupation assignments of petitioners seeking H-1B visas for employees they intend to place at third-party worksites, as per USCIS policy, to furnish evidence that the petitioner has "specific and non-speculative qualifying assignments in a specialty occupation for the beneficiary for the entire time requested in the petition"(*Policy*

*Memorandum, Contracts and Itineraries Requirements for H-1B Petitions Involving Third-Party Worksites, PM-602-0157*),   the denial was improper because the Plaintiff provided the necessary information.

65. On June 27, 2019, USCIS issued a Request for Evidence ("RFE"), alleging that the information provided did not establish the availability of specialty occupation work at the start date and during the requested validity period, at the end-client location.

66. The RFE requested numerous items previously submitted by Plaintiff, including copies of signed contractual agreements, statements of work, work orders or services, evidence of actual work assignments, which might include technical documentation, a letter signed by an authorized official of each ultimate end-client, copies of relevant, signed contractual agreements between the Plaintiff and all other companies involved in Ms. Gaonkar's placement at the third-party worksite.

67. Plaintiff timely responded to the RFE. In this response, Plaintiff included a letter issued by end-client Cisco Systems, Inc. confirming that Ms. Gaonkar's services are anticipated for their continuous and critical project; a copy of middle vendor Zenar's letter clearly outlining the relationship between the middle vendor and end-client Cisco Systems, and confirming the two year duration of the project with high possibility of getting extended; a copy of Statement of Work ("SOW") issued by the end-client to the middle vendor, 'Zensar' exclusivity for Ms. Gaonkar, clearly defining the specialty occupation services to be performed by the beneficiary and the work product to be delivered by her. The "SOW" is valid until July 26, 2023. Further, the Plaintiff provided a recently assessed Project review by the end-client, Cisco, confirming the technical phases and length of the project until at least Financial year 2023, specifying each year's goals of the Project.

68. On July 10, 2019, USCIS denied the petition filed by Plaintiff on behalf of Ms. Gaonkar, summarily disregarding all of the evidence, including all the contracts, statements of work, and project review documentation provided in the RFE response. Ultimately, the Government denied the petition stating that "the record is insufficient to establish that the position offered to the beneficiary qualifies as a specialty occupation and that the beneficiary will perform services in a specialty occupation for the requested period of intended employment."

69. The foregoing conclusion by Defendants-that the record is insufficient to establish that the position offered to the beneficiary qualifies as a specialty occupation and that the beneficiary will perform services in a specialty occupation for the requested period of intended employment-is arbitrary, capricious, and abuse of discretion, and/or not in accordance with law.

**COUNT THREE**
**Violation of the Administrative Procedure Act**
**5 U.S.C. §701, et seq.**

70. Plaintiff re-alleges and incorporates by reference herein all of the above allegations set forth above.

71. The APA empowers this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

72. Plaintiffs need only prove one of the four 8 C.F.R. §214.2(h)(4)(iii)(A) grounds by a preponderance of the evidence in order to establish that a position is a "specialty occupation."

73. The first one of the four 8 C.F.R. §214.2(h)(4)(iii)(A) grounds is that a "bachelor's degree or higher degree or its equivalent is normally the minimum requirement for entry into the particular position.

74. Plaintiff, as part of its H-1B application, provided an LCA signed by the U.S. Department of Labor certifying that the Project Manager position at issue, in this case, was properly within SOC Code 15-1199 with SOC occupation title "Computer Occupations, All Other."

75. Defendants, however, denied the H-1B application. In their denial, USCIS misstated the law in concluding that, while a showing that at least one of the requirements in 8 C.F.R. §214.2(h)(4)(iii)(A) is necessary to establish that the job falls within a specialty occupation, such showing is not sufficient to satisfy the statutory definition. This interpretation contravenes the plain language of the regulation. Additionally, in stating that the regulatory criteria are "supplemental" to the statutory definition, the decision impermissibly imposed evidentiary requirements beyond those required by Congress. By satisfying two of the regulatory criteria, Plaintiff demonstrated that its job is in a specialty occupation.

76. In finding that Sai Cornerstone Inc. did not satisfy the second regulatory criterion, second prong (8 C.F.R. § 212.2(h)(4)(iii)(A)(2)), USCIS incorrectly concluded that Plaintiff did not provide evidence sufficient to establish that the degree requirement is common to the industry in parallel positions among similar organizations. USCIS ignored the substantial supporting evidence, showing job announcements for a similar position requiring a minimum of Bachelor's degree in a related field such as 'Engineering or Technology.' The job announcements confirmed that for a similar position and identical job duties, the

client's requirements include about years of project management experience with a minimum of Bachelor's degree in Computer Science, Engineering, Technology, or related field making it a specialty occupation, all of which Ms. Gaonkar possesses to competently perform the assigned complex responsibility.   Here, the Plaintiff is an Information Technology services' consulting company especially seeking professional technical services candidates to be placed at various client sites pursuant to service agreements in accordance with the nature of their business. In this instance it is the end-client, Cisco, through Zensar (vendor) with specific requirements for this position requiring minimum Bachelor's degree in engineering or technology related field along with related project management experience.

77. Further, USCIS incorrectly concluded that Plaintiff did not provide evidence sufficient to establish that Plaintiff's detailed description of the Project Manager's duties did not establish that the position was so complex as to require a bachelor's degree in the specialized field. USCIS ignored the substantial supporting evidence explaining the complex nature of the job, including a letter from Plaintiff's technical manager explaining the extended technical description of the work to be performed by the beneficiary. The description provided the percentage of time spent on each duty, an explanation of the educational requirements for each duty, and an explanation of how Ms. Gaonkar's educational background directly relates to each duty. The technical manager's explanation especially confirms why a specialized knowledge through certain education and experience is required to accomplish the assigned tasks.

78. The fourth criterion for an H-1B specialty occupation is that the nature of the specific duties is so specialized and complex that knowledge required to perform the duties is

usually associated with the attainment of a bachelor's degree. This criterion is similar to the second prong discussed above. In the RFE, USCIS requested Sai Cornerstone to submit an explanation of the specific duties, as they related to its products, and services, and how those duties of the offered position are so specialized and complex, that they are usually associated with the attainment of a bachelor's degree or higher in a specific field of study.

79. In response to the RFE, Sai Cornerstone submitted an extremely detailed statement of Ms. Gaonkar 's job duties which clearly explained the specialized and complex nature of her job. Sai Cornerstone also submitted an explanation by its technical manager about a typical day of the beneficiary in the proffered position along with the percentage of time allocation, performing elaborated complex and unique duties requiring specialized knowledge obtained through minimum bachelor's level education in a specific relevant field.

80. In spite of the overwhelming evidence submitted by Sai Cornerstone in response to the RFE, USCIS erroneously stated in its denial that "the provided duties were described in generalized and abstract terms that lack sufficient detail to show that the nature of the duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a bachelor's degree or higher or its equivalent in a specific specialty." USCIS ignored the detailed statement of job duties submitted by Sai Cornerstone as well as the documentary examples of her work product.

81. USCIS acted arbitrarily and capriciously by failing to articulate a satisfactory explanation for the denial that rationally connected the acts to the decision on the above points. USCIS ignored substantial evidence in the record regarding the specialized and complex

nature of Ms. Gaonkar's job, and it incorrectly applied the fourth criterion for an H-1B specialty occupation.

82. USCIS stated in its denial that the burden of proof to establish eligibility for the benefit rest with Sai Cornerstone, and that the burden has not been met. However, USCIS did not articulate what burden of proof applies in this case.

83. The burden of proof in an H-1B petition is preponderance of the evidence, which means "more likely than not to be the case." *Matter of Chawathe*, 25 I&D Dec. 369, 375-76 (AAO 2010). Sai Cornerstone has met that burden in this case. In denying the petition, it appears that USCIS may have applied a higher burden of proof, such as "clear and convincing" or "beyond a reasonable doubt."

## COUNT FOUR
### Injunctive Relief for Violation of Administrative Procedure Act
### 5 U.S.C. § 705

84. Plaintiff re-alleges and incorporates by reference herein all of the above allegations set forth above.

85. Pursuant to 5 U.S.C.  705. This Court may issue all necessary and appropriate process to postpone the effective date of agency action or to preserve the status or rights pending the conclusion of the review proceedings.

86. The denial of Sai Cornerstone H-1B petition will prevent Sai Cornerstone from continuing to employ Ms. Gaonkar in the United States on critical ongoing IT projects.

87. Postponing the effectiveness of the denial will not cause any harm whatsoever to the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Hold unlawful and set aside USCIS' decision denying the I-129 petition filed by Sai Cornerstone on behalf of Ms. Gaonkar;

(3) Order Defendants to approve the I-129 petition filed by Sai Cornerstone on behalf of Ms. Gaonkar;

(4) Grant reasonable attorney's fees and costs as provided under the Equal Access to Justice Act and the APA;

(5) Grant Plaintiffs an injunction postponing the effectiveness of USCIS decisions denying the I-129 filed by Sai Cornerstone on behalf of Ms. Gaonkar retroactively as of the date the decision was made; and

(6) Grant such further relief as the Court deems just and proper.

DATED this 19th day of September, 2019:

_____/s/_____

Hassan M. Ahmad, Esq. (DDC: MD16049)
THE HMA LAW FIRM PLLC
7926 Jones Branch Dr #600
McLean VA 22102
Tel: 703.964.0245
Fax: 703.997.8556
hma@hmalegal.com
Counsel for Plaintiffs


_____/s/_____

Dobrina Ustin, Esq. (DC Bar 1011318)
*Pro Hac Vice* Forthcoming
USTUN LAW GROUP PLLC
12700 Hillcrest Rd. #125
Dallas, TX 75230
Tel:  469.994.9407
dobrina@ustunlawgroup.com
Counsel for Plaintiffs
